Filed 3/5/13  Simmons v. Cal. Physician's Service CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LONNIE LEE SIMMONS, | B235171 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC434798) |
| v. | |
| CALIFORNIA PHYSICIANS' SERVICE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. William F. Fahey, Judge.  Affirmed.

Taylor & Ring, John C. Taylor; Esner, Chang & Boyer, Stuart B. Esner, Andrew N. Chang and Holly N. Boyer for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Brad W. Seiling, Adam Pines, and Joanna S. McCallum for Defendant and Respondent.

_____

Lonnie Simmons filed a complaint against California Physicians' Service doing business as Blue Shield of California (Blue Shield), alleging Blue Shield wrongfully denied coverage for medical services he received while he was participating in a Blue Shield health plan. The trial court granted summary judgment to Blue Shield. Simmons contests the judgment on appeal. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2004, Pamela Mason purchased a Blue Shield health plan to cover herself and her husband, Lonnie Simmons. From January 2006 through September 2009, Mason and Simmons were covered under a Blue Shield PPO health plan. In all of the health plan agreements Mason and Simmons had with Blue Shield between 2004 and 2009, the policy or plan documents included a provision regarding "medical necessity." The provision stated:

"Benefits are provided only for Services that are Medically Necessary.

"1. Services which are Medically Necessary include only those which have been established as safe and effective, are furnished in accordance with generally accepted professional standards to treat an illness, injury, or medical condition, and which, as determined by Blue Shield of California, are:

"a. Consistent with Blue Shield of California medical policy; and

"b. Consistent with the symptoms or diagnosis; and

"c. Not furnished primarily for the convenience of the Member, the attending Physician or Other Provider; and

"d. Furnished at the most appropriate level which can be provided safely and effectively to the Member. [¶] . . . [¶]

"4. Blue Shield of California reserves the right to review all claims to determine whether Services are Medically Necessary, and may use the services of physician

2

consultants, peer review committees of professional societies or hospitals, and other consultants."[1]

**Denial of Coverage for IVIG**

In 2004, Simmons fell ill. He first experienced pain in his feet, then became unable to walk and lost his voice. Doctors did not know what was wrong. Eventually, in August 2005, Simmons was diagnosed with Guillain-Barre syndrome (GBS), an autoimmune disorder. At that time, Simmons's neurologist, Kolar Murthy, prescribed intravenous immunoglobin treatments (IVIG). IVIG is "a treatment under which the patient receives an intravenous infusion of immunoglobulin . . . that has been extracted from the plasma of blood donors." The treatments were administered by Biofusion, a "participating" or "contracted" provider with Blue Shield. Under its agreements with Blue Shield, Biofusion agreed to pursue any payment disputes only with Blue Shield rather than with the patient receiving treatment.

Blue Shield paid Biofusion for the first two IVIG treatments. However, Blue Shield subsequently conducted a "medical review" of Simmons's IVIG treatments. In January 2006, Blue Shield issued an explanation of benefits to Mason regarding Biofusion's claim for payment for services rendered in November 2005. The explanation stated Blue Shield could not complete processing of the claim "because our medical review requires additional information. A letter, which identifies the specific information requested, has been sent to you and the provider of service under separate cover. If the requested information is not received within 45 days of your receipt of our request, please consider this claim denied." The record does not include the letter referenced in the explanation of benefits, or any response from Biofusion or Simmons's doctor.

---

[1]     This language is taken from the Evidence of Coverage and Health Service Agreement dated February 2007. Although Simmons had two types of plans between 2004 and 2009, and four different health service agreements, the language of the medical necessity provision was largely the same in each agreement.

In April 2006, Blue Shield issued Mason another explanation of benefits informing her: "The patient's clinical situation was individually evaluated by a medical consultant. Based on the documentation provided, the medical need for this was not established. An internal rule, guideline, protocol, or other similar criteria and/or scientific or clinical judgment was relied upon in making this determination. You may receive free of charge, upon request, a copy of the internal rule guideline, protocol or similar criteria and/or an explanation of the scientific or clinical judgment used in this determination. This information can be obtained by contacting your Customer/Member Services Department at the mailing address or telephone indicated on the front of this form."

Despite this denial, Biofusion continued providing IVIG treatments to Simmons. In November 2006, Biofusion appealed the claim denial. Biofusion's appeal attached a July 2006 letter from Dr. Murthy. Dr. Murthy's letter described Simmons's need for a continuous passive motion machine. The letter also explained Simmons's diagnosis and progress, indicating he was making slow but steady improvement, although he had experienced a setback in walking. In February 2007, Blue Shield denied the appeal in a letter to Biofusion. The letter stated:

"Based on the documentation submitted, our Physician Advisor has determined that the 'appeal letter is for the use of Continuous Passive Motion which is not related to this claim. IVIG indicated in Guillain-Barre Syndrome only within 2 weeks of diagnosis; on-set of illness in this patient was November 2004. There is no scientific basis for long term IVIG administration and this is denied per Blue Shield of California Medication [Policy.'] Therefore, no additional payment can be made. [¶] If you have any further questions regarding the status claim, please contact the Customer Service Department by calling . . . ."

The letter also detailed a "Final Appeal Procedure." In April 2007, Dr. Murthy sought reconsideration of the claim denial. Murthy explained he had changed Simmons's diagnosis to "the chronic form of Guillain-Barre, chronic inflammatory demyelinating polyneuropathy (CIDP)." Murthy noted "all major health plans and Medicare"

4

recognized the use of IVIG for treatment of CIDP, and warned that without continued IVIG treatments, Simmons's condition would deteriorate.

In May 2007, Mason wrote Blue Shield complaining of the lack of response since the previous denial, and informing Blue Shield that Simmons's condition had deteriorated. Later that month, Blue Shield submitted the claim to Dr. Lee Hartman for review. Hartman is a specialist in otolaryngology, head and neck surgery, but also served as a Blue Shield medical director in the company's appeals and grievances department. When reviewing a subscriber's appeal, Hartman relied on Blue Shield's internal medical policies. In deposition testimony and a declaration supporting the summary judgment motion, Hartman explained the Blue Shield policies are established by a Blue Shield "Pharmacy and Therapeutics committee." At his deposition, Hartman testified: "The committee uses pharmacists and independent physicians in the community of different specialists to review current drug therapies and determine what the appropriate indications are for it, what are acceptable alternatives for it, and put that forth to the Blue Shield plan for making determinations of formulary decisions of what drugs they're going to allow on formulary and approve and under what conditions." According to Hartman, for any given medication, "the committee reviews the clinical and scientific evidence relating to the medication and, based on that review, establishes guidelines and medical policy positions as to whether or not the medication is safe and effective and covered by the Plan."

In Simmons's case, Hartman reviewed the claim denials, medical records Murthy submitted to Blue Shield, and "Blue Shield's medical policy for IVIG." The medical policy indicated Blue Shield would only cover IVIG as treatment for GBS when the disease was diagnosed within the first two weeks of the illness, and treatment began within four weeks of the onset of symptoms. Hartman noted Simmons experienced GBS symptoms in November 2004 but was not diagnosed with the disease until August 2005, and did not receive IVIG treatments until August 2005.

The medical policy also indicated IVIG would only be covered as treatment for CIDP when three of five criteria were met.[2] Hartman determined the medical records Biofusion and Murthy had submitted "did not indicate that requirement was satisfied in [Simmons's] case." Hartman thus concluded there was no coverage for Simmons's IVIG treatments.

In June 2007, Blue Shield sent Simmons a letter informing him it denied his appeal. The letter indicated "[t]he principal reason for the denial" was "there is currently insufficient information to support your neurologist's change of diagnosis from [Guillain]-Barre CIDP." The letter provided the "clinical rationale," which was Blue Shield's medical policy requiring the presence of three of five listed criteria to authorize IVIG for CIDP patients. The letter concluded "medical necessity for IVIG was not

---

[2]  The criteria were:
  "• Motor or sensory dysfunction of more than 1 limb developing over at least 2 months
  "• Hypo- or areflexia
  "• Nerve conduction studies including studies of proximal nerve segments in which the predominant process is demyelination. Must have 2 of 4 [Saperstein only requires 2/4]:
      "1. Reduction in conduction velocity (CV) in 2 or more motor nerves:
          "a. <80% of lower limit of normal (LLN) if amplitude >80% of LLN
          "b. <70% of LLN if amplitude <80% of LLN
      "2. Partial conduction block (CB) or abnormal temporal dispersion (TD) in 1 or more motor nerves
      "3. Prolonged distal latencies in 2 or more nerves:
          "a. >125% of upper limit of normal (ULN) if amplitude >80% of LLN
          "b. >150% of ULN if amplitude <80% of LLN
      "4. Absent F waves or prolonged minimum in two or more nerves
      "a. >120% of ULN if amplitude >80% of LLN
      "b. >150% of ULN if amplitude <80% of LLN
  "• Nerve biopsy showing unequivocal evidence of demyelination and remyelination. Demyelination by either electron microscopy (>5 fibers) or teased fiber studies >12% of 50 fibers, minimum of 4 intermodes each, demonstrating demyelination/remyelination.
  "• Cell count <10/mm-3 if HIV-seronegative or <50/mm-3 if HIV seropositive."

6

established." It further informed Simmons he had the right to request an independent medical review through the Department of Managed Health Care (DMHC). The letter also advised Simmons he could request a copy of Blue Shield's "Medical Policy."

Simmons received his last IVIG treatment from Biofusion in February 2007. In November 2007, Blue Shield sent a letter to Simmons, copied to Murthy, indicating medical necessity was met for IVIG treatments for three months from November 1, 2007.[3]

### Denial of Coverage for Fentora

In October 2007, another of Simmons's doctors, James Lin, prescribed the pain medication Fentora, "a powerful and highly addictive Schedule II narcotic . . . containing the drug Fentanyl." According to Lin, of "all the opiate medications, neuropathic medications, antidepressants, [and] muscle relaxers" Simmons tried, Fentora helped him most with his pain, increasing his activity and energy, and providing him a better state of well being.

In October 2007, Blue Shield sent Lin a letter indicating it would not provide coverage for Fentora. The letter informed Lin: "The Clinical information submitted by your provider for coverage of the above medication does not meet the coverage criteria established by the Blue Shield of California Pharmacy and Therapeutics Committee for the following reason(s): [¶] Fentora is covered only for the management of breakthrough cancer pain." The letter advised that if specific additional information supporting the

---

[3]     In its appellate briefing, Blue Shield asserts that in the fall of 2007, Murthy requested preauthorization of IVIG treatments for Simmons's CIDP. The only record citation Blue Shield provides to support the statement is to Murthy's declaration, in which he states that when Simmons was hospitalized in 2007, he "again expressed that IVIG would be beneficial to Mr. Simmons." In the appellant's brief, Simmons's recitation of the facts does not indicate Murthy made another request for authorization of IVIG treatments. The record provides no other information to explain the November 2007 authorization.

request was provided, Blue Shield would perform additional clinical review.[4]  A similar letter explaining the rationale for the denial was also addressed to Simmons.  Despite this denial, Blue Shield reimbursed Simmons for Fentora he purchased between October 2007 and June 2008.

In July 2008, Blue Shield amended Simmons's health plan.  The amended Plan included a drug formulary.  The Evidence of Coverage indicated that while benefits would be provided for drugs listed on the formulary, "[b]enefits may also be provided for Non-Formulary Drugs subject to higher Copayments.  Selected Drugs and Drug dosages . . . require prior authorization by Blue Shield of California for Medical Necessity appropriateness of therapy or when effective, lower cost alternatives are available (The more costly alternatives will be authorized when Medically Necessary)."  The provision stated subscribers could find out if a drug was on the formulary by calling Blue Shield, requesting a printed copy, or accessing a listed website.  The drug formulary for 2007 to 2008 identified Fentora as a nonformulary drug that required "medical necessity prior authorization."  On July 1, 2008, Blue Shield told an employee in Lin's office that Blue Shield would approve only one month of Fentora and it needed more information from Lin to determine medical necessity.

In August 2008, Blue Shield sent Lin another letter denying coverage for Fentora because the drug was covered only for the management of breakthrough cancer pain.  The letter included the same invitation to submit additional information as that of the October 2007 denial letter.  Simmons continued taking Fentora.  In February 2009, Lin's office submitted a preauthorization request for Fentora.  Blue Shield denied the request, again indicating Fentora was covered only for the management of breakthrough cancer pain.

---

**4**     The information requested was:  "Clinical reasons inclusive of intolerable side effects, contra-indication or cautions that will prohibit your patient from using formulary alternative(s)  [¶]  • Two peer reviewed literature for drugs being used for off-label indications  [¶]  • Any laboratory parameters supporting your request  [¶]  • Any previous medications tried along with the outcome of the trial."

On March 3, 2009, Simmons appealed Blue Shield's denial of coverage. Blue Shield submitted the appeal to Hartman. As he had when reviewing the IVIG issue, Hartman consulted the Blue Shield medical policy, which indicated coverage would only be approved if the patient was diagnosed with cancer pain and the drug was prescribed for the management of breakthrough pain in patients who were already receiving, and were tolerant to, opioid therapy for their pain. Hartman "saw that [Simmons's] primary diagnosis was GBS, and that [Simmons's] had not been diagnosed with any form of cancer. Accordingly, the Fentora that was prescribed for him was not in accordance with Blue Shield's medical policy or covered under the Plan."[5]

Blue Shield sent Simmons a letter dated March 6, 2009, denying his appeal. The letter indicated the "principal reason for the denial is that you do not meet the Blue Shield of California Medication Policy criteria for approval. [¶] Specifically, the clinical rationale for the denial is that Fentora is only Food and Drug Administration (FDA) and Blue Shield authorized for breakthrough cancer pain. According to the documentation, you do not have this condition. There is insufficient evidence in the peer reviewed medical literature to conclude the off-label use of this medication is superior to currently available and approved alternatives. Based on the information provided, you did not meet the coverage criteria established by the Blue Shield of California Pharmacy and Therapeutics Committee. Therefore, we are unable to comply with your request." The letter was signed by a coordinator in the Blue Shield grievance department.

Simmons subsequently requested an independent medical review from the DMHC. On March 30, 2009, the DMHC issued a decision. The DMHC reported an independent

---

[5] Although opioid tolerance was also a factor in the medical policy, Hartman's declaration indicated only that he concluded the drug was not medically necessary for Simmons because he did not have cancer.

medical reviewer had determined Fentora was not medically necessary for Simmons.[6] The independent reviewer explained the findings:

"The package insert for Fentora specifically states it is indicated only for cancer related pain. There are no studies in the literature that support the use of Fentora in neuropathic pain or in the patient's specific syndrome, ascending polyneuropathy and Guillain-Barre disease. Other opiates as well as the anti-convulsants have been studied for their efficacy in Guillain-Barre syndrome. However, as concluded by Pandey and colleagues, buccal fentanyl (Fentora) has not been examined for this disease. Its efficacy for the treatment of the patient's condition has not been established. Furthermore, Fentora was designed to address breakthrough pain and not as a medication to be taken around the clock, 5-10 times per day. [¶] Therefore, I have determined that the medication at issue was not and is not medically necessary for treatment of the patient's medical condition."[7]

**Litigation**

Simmons filed suit against Blue Shield in June 2010. Following a demurrer, Simmons was left with claims for breach of contract and breach of the implied covenant

---

[6] The independent medical reviewer described his or her qualifications: "I am board certified in anesthesiology and pain medicine and I am actively practicing. I am an Adjunct Assistant Professor of Anesthesiology at an academic medical institution. I am knowledgeable in the treatment of the enrollee's medical condition, knowledgeable about the proposed treatment, and familiar with guidelines and protocols in the area of the treatment under review. In addition, I hold a current certification by a recognized American medical specialty board in the area or areas appropriate to the treatment under review. I have no history of disciplinary action or sanctions against my license."

[7] There was also evidence that on more than one occasion, Blue Shield representatives at times told Simmons that Blue Shield would reimburse him for Fentora he purchased, at least for limited time periods. Although these representations formed the basis of some of Simmons's arguments in the trial court in opposition to summary judgment, he does not repeat those arguments on appeal. Simmons has apparently abandoned any theory of liability based on those representations of reimbursement, thus we do not discuss them, or detail the related factual background. (*Walker v. Sonora Regional Medical Center* (2012) 202 Cal.App.4th 948, 957, fn. 6; *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 537-538.)

of good faith and fair dealing. Blue Shield moved for summary judgment or summary adjudication. As to the denial of payment for IVIG treatments, Blue Shield asserted the claims were barred by a two-year contractual limitations period; Simmons never received pre-authorization for the treatments as required by the plan; the IVIG treatments were not medically necessary as defined by the plan because they were inconsistent with Blue Shield's medical policy; and Simmons suffered no damages because he was never required to pay for any IVIG treatments. As to the complaint as a whole, Blue Shield argued there were no triable issues of fact because the treatments prescribed for Simmons were not consistent with Blue Shield's medical policy and therefore they were not medically necessary under the plan. Blue Shield contended it could not be liable on a bad faith theory because it did not breach the plan, and further because a genuine dispute existed as to the payment of benefits.

In support of its motion, Blue Shield provided a declaration from Hartman explaining the Blue Shield medical policies for IVIG and Fentora, and describing his process in reviewing and denying Simmons's claims. Hartman's declaration also authenticated various documents, including the relevant medical policies.

Simmons opposed the motion, arguing Blue Shield could not rely on the "medical policy" prong of the medical necessity definition because the term "medical policy" was not mentioned in the exclusion section of the plan and was not defined. Simmons argued his doctors' deposition testimony created a triable issue of fact as to whether the denied treatments were medically necessary. Simmons further contended the evidence created a triable issue of fact on his claim that Blue Shield failed to adequately investigate Simmons's claims for coverage.

Each side objected to portions of the other's evidence. Simmons objected to Hartman's description of Blue Shield's medical policies, his description of the manufacturer warnings for Fentora, his description of the FDA warnings for the drug, and his conclusion that consistent with the manufacturer and FDA warnings, the Blue Shield Pharmacy and Therapeutics Committee established Fentora is only medically necessary for opioid-tolerant patients with cancer suffering from breakthrough pain. Among other

11

things, Blue Shield objected to portions of Mason's declaration describing an August 2008 telephone call with Blue Shield in which a Blue Shield representative stated Fentora would be covered. Blue Shield also objected to portions of a supporting declaration from Dr. Murthy, in which he opined IVIG was medically necessary when he prescribed it, and the stop in treatments caused Simmons's condition to deteriorate, leading to substantial pain and a hospitalization.

The trial court sustained all but one of Blue Shield's objections to Simmons's evidence and granted summary judgment. The court adopted most of an order prepared by Blue Shield, listing undisputed facts. In addition to the party-prepared order, the court noted: "In fact, plaintiff's separate statement did not dispute most of defendant's undisputed facts. Plaintiff's few 'disputes' consist mostly of argument and no citation to supporting evidence." This appeal timely followed.

## DISCUSSION

### I. Summary Judgment/Adjudication Standard of Review

"The rules applicable to summary judgments apply equally to motions for summary adjudication. . . . Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. . . . Accordingly, we are not bound by the trial court's stated reasons and review only the ruling, not its rationale. . . . [¶] A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. . . . A triable issue of material fact exists 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)"

12

(*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 732, citations omitted.)

## II.     Blue Shield's Denial of Coverage for IVIG Cannot Form the Basis of Simmons's Claims

Simmons alleges Blue Shield's denial of coverage for IVIG treatments and Fentora breached the health care plan (Plan), and the implied covenant of good faith and fair dealing.  Blue Shield argues the denial of coverage for IVIG is not actionable because it is barred by a two-year contractual limitations period.  We agree that the IVIG denial cannot form the basis of Simmons's claims.

As an initial matter, Simmons contends the contractual limitations period could not provide a basis to summarily adjudicate his IVIG-based allegations because they did not constitute a separate claim.  (Compare *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1853-1854 (*Lilienthal*) with *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 422-423 & *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 96-98.)  We disagree.

In *Lilienthal*, the court approved the use of summary adjudication in a case like this one, in which two separate and distinct wrongful acts are combined in one cause of action.  (*Lilienthal*, *supra*, 12 Cal.App.4th at pp. 1854-1855.)  As in that case, Simmons seeks "to recover damages based on two separate and distinct obligations.  Each obligation creates a separate and distinct claim. . . .  [¶]  . . .  [¶]  [U]nder subdivision (f) of section 437c [of the Code of Civil Procedure], a party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action."  (*Ibid*.)  Although the claims here arose out of one contractual relationship, they were based on separate and distinct denials of coverage, involved requests for different medical services prescribed by different doctors, and the claims accrued at different times.  (*CDF Firefighters v. Maldonado* (2011) 200 Cal.App.4th 158, 165; *Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1117-1118.)  Thus, we consider whether there were any triable issues of fact as to whether the IVIG-based claim was time-barred.

13

## A. The Plan's Limitations Period

The January 2006 plan documents contained the following provision regarding commencement of legal action: "Any suit or action to recover benefits under this Agreement, or damages concerning the provision of coverage or benefits, the processing of claims, or any other matter arising out of this Agreement, shall be commenced no later than two years after the date of coverage for benefits in question were first denied, unless a shorter period of limitations otherwise applies."[8] Blue Shield first denied coverage for IVIG treatments in April 2006. Letters confirming the denial followed in February 2007 and June 2007. In November 2007, Blue Shield indicated it would cover three months of prospective IVIG treatments, beginning November 1, 2007. Simmons did not file suit until June 2010.

Simmons does not challenge the validity of the limitations provision. Instead, he argues he was not obligated to file suit within two years of the IVIG denials because (1) the time to file was tolled since Blue Shield did not unequivocally deny his claim for coverage for IVIG; and (2) the relationship was one of continuing contractual obligations, so he could wait until a time for "complete performance" before filing suit. The record establishes there was no triable issue of fact on the tolling contention, and we reject Simmons's "complete performance" argument.

## B. No Triable Issue of Fact on Tolling

In general in the insurance context, a contractual limitations period "is tolled from the time the insured gives notice of the claim to the insurance company until 'the time the insurer formally denies the claim in writing.' [Citations.] This has been construed to mean 'unequivocal' denial in writing."[9] (*Migliore v. Mid-Century Ins. Co.* (2002) 97

---

[8]    This language, or a similar provision was included in all but the last Evidence of Coverage. The last plan document was dated July 2008, well after Blue Shield had denied coverage for IVIG.

[9]    Blue Shield indicates it is a health care service plan. However, many of the principles relevant to insurance policies and the relationship of an insurer and insured remain applicable. (*Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 3, fn. 1

Cal.App.4th 592, 604.) It was undisputed that Simmons received multiple notices that Blue Shield would not provide coverage for IVIG treatments. In April 2006, Blue Shield sent Mason a notice explaining that it did not pay the Biofusion claim because the "medical need" for the treatment was "not established." In June 2007, Blue Shield sent Simmons a letter in response to the Biofusion appeal from the denial of coverage. The letter unequivocally indicated Blue Shield would not authorize coverage for the past IVIG treatments and denied the appeal. Even if a jury found the June 2007 letter was the first unequivocal denial of coverage for the IVIG treatments Simmons received, Simmons's complaint was filed well after two years had passed from the date of that letter.

Simmons also argues that Blue Shield's consideration of additional evidence and his and Biofusion's appeals of the denials tolled the limitations period. But once there has been an unequivocal denial, an insurer's willingness to consider additional evidence does not toll the limitations period further. (*Singh v. Allstate Ins. Co.* (1998) 63 Cal.App.4th 135, 143-144.) We also disagree that the November 2007 letter authorizing three months of future treatments created a triable issue of fact on whether Blue Shield had unequivocally denied coverage for the already-administered IVIG treatments. No trier of fact could reasonably infer from the November 2007 letter that Blue Shield was reconsidering or continuing to consider whether it would retroactively cover the *prior* IVIG treatments. The record includes no evidence suggesting Blue Shield continued to consider whether to provide payment for the already-administered IVIG treatments after June 2007, or that it made any representations to Simmons suggesting Biofusion's past

---

(*Sarchett*); *Imbler v. PacifiCare of Cal., Inc.* (2002) 103 Cal.App.4th 567, 573; *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1323-1324, fn. 1.) We note, however, that the limitations provision at issue here differs from many first party insurance policy provisions requiring the insured to file a suit within a certain time, commencing with the date of the covered loss, rather than the date the insurer denies coverage. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 6:93, p. 6A-16.) We assume without deciding that the tolling principles discussed above apply in this case.

15

claims were still under consideration. Yet, Simmons did not file his complaint until June 2010, three years after the June 2007 denial, and more than two years after the November 2007 letter.

### C. Continuing Obligations

We also reject Simmons's contention that there was a continuing duty in this case, and he therefore was not obligated to file suit until the time for "complete performance" had passed. The language upon which Simmons relies comes from *Lambert v. Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1078 (*Lambert*), as quoted in *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489-490 (*Romano*). A consideration of the "continuing duty" in the context of each case demonstrates the reasoning is not applicable here.

*Lambert* concerned a title insurer's failure to defend the insured. The *Lambert* court concluded that "[a]lthough the statutory period commences upon the refusal to defend, it is equitably tolled until the underlying action is terminated by final judgment." (*Lambert*, *supra*, 53 Cal.3d at p. 1077.) The court explained equitable tolling applied because the duty to defend "commences upon tender of the defense, and continues until the underlying lawsuit is concluded." (*Ibid.*) Given how long it could take for the underlying litigation to end, without tolling an insured might have to sue the insurer before the underlying litigation was over, and before the insurer's duty to defend had expired. The court rejected this result.

The *Lambert* court further recognized that "California courts have long given the 'plaintiff, in cases where a continuing duty has been breached, the option of filing suit when the time for complete performance has passed.' [Citations.]" (*Lambert*, *supra*, 53 Cal.3d at p. 1078.) The *Lambert* court cited language from *Union Sugar Co. v. Hollister Estate Co.* (1935) 3 Cal.2d 740, in which the parties had an executory beet farming contract that could not be completed until the conclusion of the beet season of 1925. (*Union Sugar,* at p. 745.) In *Union Sugar*, the injured party was not required to file suit at the first of several breaches, and could wait until the time for "complete performance" to sue. The *Lambert* court found the parties' obligations in *Union Sugar* similar to an

16

insurer's duty to defend an insured, which continues until the underlying suit is completed. However, *Lambert* does not stand for the proposition that with respect to a claim of a covered loss, or an analogous context, the insurer has a continuing duty with respect to claims it has unequivocally denied, and where the loss is complete rather than ongoing, such that any limitations period is tolled indefinitely until the entire contract is terminated.

*Romano* concerned a wrongful termination claim. The plaintiff's employer told him he would be terminated at a certain date in the future. His employment did not end until that date. (*Romano, supra,* 14 Cal.4th at pp. 484-485.) The *Romano* court concluded the statute of limitations began to run when the plaintiff was actually terminated, not when the employer gave notice that he would be terminated in the future. (*Id.* at p. 490.) After discussing the "time . . . for complete performance" language in *Lambert*, the *Romano* court reasoned the employer made an implied promise not to terminate the plaintiff without good cause, and the claim did not accrue until the termination. The court alternatively reasoned the employer's notice that it intended to terminate the plaintiff in the future was an anticipatory repudiation of the contract. (*Romano,* at p. 490.) Here, analogous reasoning would be that Blue Shield obligated itself to pay for medical treatments Simmons required. Once it failed to do so by denying coverage for IVIG, the claim accrued. There were no facts suggesting Blue Shield's failure to provide coverage for IVIG could be construed as merely an anticipatory repudiation of the parties' agreement.

The time for Simmons to commence legal action was governed by the Plan's limitations period, the validity of which Simmons does not contest. Under that provision, he was required to file suit no later than two years after Blue Shield denied coverage for the treatment he was seeking. Simmons has provided no legal authority for the proposition that despite the presence of a contractual limitations period in a health service plan or analogous insurance context, he had the option of waiting until a theoretical future time of "complete performance," which in his view did not occur in this case until he ceased paying premiums and Blue Shield terminated coverage. (See *Magnolia Square*

17

*Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1059-1060 [rejecting argument that contractual limitations period did not begin to run until insured had proof of structural defects, rather than at time it knew or should have known of the defects]; *State Farm Fire & Casualty Co. v. Superior Court* (1989) 210 Cal.App.3d 604, 609 [insured's cause of action accrues at the latest upon the date of unconditional denial].)

The record contains no evidence demonstrating a triable issue of fact on the timeliness of the IVIG-based claim. The allegation that Blue Shield unlawfully denied coverage for IVIG treatments could not form the basis of either a breach of contract or bad faith claim. (*Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 718.) The remainder of our analysis concerns only the denial of coverage for Fentora.

## III. No Triable Issue of Fact on the Breach of Contract Claim

Blue Shield's argument for summary disposition of the breach of contract claim is straightforward. The Plan indicates Blue Shield will only cover medically necessary treatment. It sets forth a multifactor definition of "medically necessary." In addition to "being established as safe and effective," and "furnished in accordance with generally accepted professional standards to treat illness, injury, or medical condition," to be a "medically necessary" treatment, Blue Shield must determine four additional factors are present. The first of these factors is that the treatment must be consistent with "Blue Shield medical policy." The medical policy for Fentora was that Blue Shield would only cover Fentora when prescribed for cancer patients suffering breakthrough pain. It is undisputed that Simmons did not have cancer. Thus, Fentora as prescribed for Simmons was not consistent with Blue Shield's medical policy. As such, it was not "medically necessary," and Blue Shield could deny coverage under the terms of the Plan.

In response, Simmons argues Blue Shield cannot rely on the "medical policy" prong of the medical necessity definition. We address each of Simmons's contentions below.

### A. No Triable Issue of Fact on the Authenticity of the Fentora Medical Policy

On appeal, Simmons's first argument is that the medical policies Blue Shield references—"detached, untitled pages from a Blue Shield internal document"—cannot

be accepted as the "medical policy" referenced in the Plan. Without any citation to legal authority, Simmons asserts there is no evidence the "untitled pages that Blue Shield claims are its 'medical policy' are part of the insurance contract" between Simmons and Blue Shield.

It is undisputed that the Plan refers to "Blue Shield medical policy." To the extent the issue is whether the documents Blue Shield has offered purporting to reflect the "medical policy" on Fentora were actually the "medical policy," Blue Shield has shown there is no triable issue of fact and Simmons has not refuted the showing. Blue Shield's medical director's declaration authenticates the documents.[10] Moreover, the evidence established that Blue Shield repeatedly advised Simmons and Dr. Lin of the clinical rationale for the denial of coverage for Fentora, which was the same as the guidelines in the "medical policy" presented in support of summary judgment. There is no evidence suggesting Blue Shield's internal guidelines on Fentora—the "medical policy"—were something other than what is represented in the documents produced in this case.[11]

---

[10] Simmons objected to this portion of Dr. Hartman's declaration. However, the record contains no ruling on Simmons's evidentiary objections. We therefore presume the objections were overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Simmons has not renewed his evidentiary objections on appeal. (*Ibid.* [burden on objector to renew objections in the appellate court].) We thus consider Hartman's declaration in its entirety. (*Ibid.* [on appeal we consider all the evidence set forth in papers except that to which objections have been made and *sustained*].)

[11] To the extent Simmons's contention is really challenging Blue Shield's reliance on its medical policy because that term is not defined in the Plan, we address the argument *infra.* In addition, Simmons is apparently not contending that reliance on the medical policy was invalid as a matter of law because the medical policy was not attached to the Evidence of Coverage, or sufficiently incorporated by reference. To the extent Simmons intended to assert that argument, he failed to support it with any legal analysis or citations to authority. Any such argument was therefore waived. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [court not bound to develop appellants' arguments; absence of cogent legal argument or citation to authority allows court to treat contention as waived].)

**B. Caselaw Does Not Establish a Particular Definition of Medical Necessity**

Simmons next contends Blue Shield's definition of "medical necessity" is invalid because it conflicts with California caselaw. Simmons asserts the Plan's requirement that a treatment be consistent with Blue Shield's medical policy to be deemed medically necessary conflicts with cases indicating "medical necessity" is an objective standard. We disagree. Although there are two published California cases that consider denials of coverage based on an alleged lack of medical necessity, neither case established a definition of the term as a matter of law. We are unable to interpret either case as invalidating the Plan's use of Blue Shield's internal treatment-specific guidelines as a factor in the medical necessity determination.

In *Sarchett*, *supra*, 43 Cal.3d 1, the California Supreme Court considered "medical necessity" in the context of a bad faith claim. Blue Shield denied Sarchett's claim for hospitalization benefits on the ground that his hospitalization was subject to an exclusion for diagnostic hospitalization, and an exclusion for medical necessity. The *Sarchett* policy's medical necessity provision stated: " 'Benefits will be provided under this contract only for such services, whether provided on an Inpatient or Outpatient basis, as are reasonably intended, in the exercise of good medical practice, for the treatment of illness or injury.' " (*Id.* at p. 4.) The trial court "found that the Blue Shield policy was ambiguous because it did not indicate who would determine when the diagnostic services or medical necessity exclusion barred coverage. Construing that ambiguity in favor of the member, it concluded that [the plaintiff] should be able to rely on the judgment of his treating physician as to the purpose and necessity of hospitalization, and that Blue Shield could not question that judgment." (*Id.* at pp. 5-6.)

Our Supreme Court rejected the trial court's interpretation of the policy. The court found the policy unambiguous in that it provided for disputes over medical necessity to be resolved by a third party, either a medical society review committee or an arbitrator. (*Sarchett, supra*, 43 Cal.3d at pp. 7, 10.) The court rejected the argument that the policy had to be interpreted as allowing the plaintiff's physician to determine what is medically necessary. (*Id.* at pp. 10-11.) Instead, the court expressly held that under the terms of

20

that policy, Blue Shield could challenge the physician's recommendation. (*Id.* at p. 10.) But the *Sarchett* court did not hold that a third party review procedure for resolving medical necessity disputes was required. The court also noted the policy before it did not allow the insurer complete discretion to determine medical necessity. (*Id.* at p. 11, fn. 13.) *Sarchett* neither offers a definition of medical necessity nor mandates that health plans employ any particular method or procedure for determining medical necessity. (*People v. Mills* (2012) 55 Cal.4th 663, 680, fn. 12 [cases are not authority for propositions not considered].)

To support his argument, Simmons relies on several portions of the *Sarchett* decision out of context. For example, Simmons contends *Sarchett* held medical necessity must be construed as an objective standard to be applied by the trier of fact. But when referring to an "objective standard," the *Sarchett* court was only describing the position courts in other states had adopted when interpreting specific medical necessity provisions, in contrast to the plaintiff's argument that the treating physician's determination of medical necessity should prevail in the event of any ambiguity in the contract. The court refused to follow an Illinois Court of Appeal case in which the court held that the absence of language in a policy regarding who would determine medical necessity prevented the insurer from denying benefits solely on the ground that it disagreed with the judgment of the treating physician. The *Sarchett* court then noted: "Numerous decisions from other jurisdictions take the position that 'medical necessity' or similar policy language is an objective standard to be applied by the trier of fact, not a delegation of power to the treating physician." (*Id.* at p. 9.) This language was not a conclusion that all policy language regarding medical necessity, regardless of the specifics of the provision, must be interpreted as setting forth an objective standard to be applied by a trier of fact.

We also find no support for Simmons's assertion that under *Sarchett*, the insurer (or health care service plan) must justify a denial of coverage by establishing the physician's judgment is unreasonable or contrary to good medical practice. Instead, the *Sarchett* court anticipated that even though insurers may retrospectively disagree with the

21

recommendation of the treating physician on medical necessity issues, the general policies governing interpretation of insurance contracts would allow most subscribers to rely on their physician's advice and receive coverage. The court rejected the plaintiff's argument that the non-ambiguous insurance policy should be construed in light of the reasonable expectations of the insured so as to cover any treatment the treating physician recommends, simply because the physician has recommended it. Rather, the court reasoned the subscriber expects coverage for a hospitalization recommended by his doctor because "he trusts that his physician has recommended a reasonable treatment consistent with good medical practice. Consequently we believe the subscriber's expectations can be best fulfilled not by giving his physician an unreviewable power to determine coverage, but by construing the policy language liberally, so that uncertainties about the reasonableness of treatment will be resolved in favor of coverage." (*Sarchett, supra*, 43 Cal.3d at p. 10.)

The *Sarchett* court further declined to invalidate unambiguous language simply to alleviate the uncertainty subscribers face when the policy allows the insurer to dispute the treating physician's determination of medical necessity. The court explained:

"In summary, we appreciate the plight of the subscriber, forced to decide whether to follow his doctor's recommendation without assurance that his policy will cover the expense. We do not, however, believe it would be alleviated by requiring the insurer to insert redundant language into the policy to make doubly clear to the subscriber that he really is in a dilemma and cannot count on coverage. And although a judicial ruling that retrospective review violates public policy would protect against retrospective denial of coverage, subscribers would pay the price in reduced insurance alternatives and increased premiums. [¶] The problem of retrospective denial of coverage can be reduced through the growing practice of preadmission screening of nonemergency hospital admissions. When such screening is not feasible, as in the present case, we think the best the courts can do is give the policy every reasonable interpretation in favor of coverage. We trust that, with doubts respecting coverage resolved in favor of the subscriber, there will be few cases in which the physician's judgment is so plainly unreasonable, or contrary to

22

good medical practice, that coverage will be refused." (*Sarchett, supra*, 43 Cal.3d at pp. 12-13.)

Thus, consistent with the rules that apply generally to the interpretation of insurance contracts, courts are to construe policy language liberally, "so that uncertainties about the reasonableness of treatment will be resolved in favor of coverage." (*Sarchett, supra*, 43 Cal.3d at p. 10.) The court expressly rejected an approach that would construe an unambiguous policy so as to give the physician the power to determine coverage, when that is contrary to the policy's language. The *Sarchett* policy's medical necessity provision was significantly different from the detailed and specific provision at issue here. *Sarchett* does not address whether medical necessity must be defined or decided in a particular way under a policy. However, as relevant here, *Sarchett* confirms that general principles of insurance contract interpretation apply, and, absent ambiguity, the plain language of the agreement controls.

*Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832 (*Hughes*) also concerned a denial of coverage based on medical necessity, but similarly did not sanction any particular definition of the term, or require that it be determined using any particular procedure. *Hughes* also considered medical necessity in the context of a bad faith claim, and we discuss it in greater detail, *infra*, in connection with the implied covenant of good faith and fair dealing. But here, we note the decision in *Hughes* does not describe how medical necessity was defined or appeared in the policy at issue in that case, and does not address how medical necessity must be *defined* in a health plan. In *Hughes*, the court concluded that a health insurer may breach the implied covenant of good faith and fair dealing if it construes "medical necessity" in a way that significantly varies from the medical standards of the community. (*Hughes*, at p. 845.) This conclusion does not render the "medical policy" factor per se invalid as a contract term in this case.

In short, we cannot conclude that either *Sarchett* or *Hughes* espouses principles that would render Blue Shield's contractual definition of medical necessity invalid because of the "consistency with Blue Shield medical policy" factor.

23

## C. Contract Interpretation Principles Do Not Require a Construction of the Plan Against Blue Shield and in Favor of Coverage

Simmons also argues the "medical policy" prong of the definition cannot be used to deny coverage because the term is not defined within the plan document and is ambiguous, and therefore it must be construed against Blue Shield. We disagree.

### 1. Applicable Legal Principles

As our Supreme Court recently explained, "In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation. [Citations.] ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.]' [Citation.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citations.] 'If contractual language is clear and explicit, it governs.' [Citation.] ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code,] § 1644), controls judicial interpretation. (*Id.*, § 1638.)" [Citations.]' [Citation.]" (*State of California v. Continental Insurance Company* (2012) 55 Cal.4th 186, 194-195 (*Continental*).)

" 'In the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.' [Citations.]" (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 961.)

A policy " 'should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert.' [Citation.]" (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1209 (*Haynes*).) The interpretation of a contract, including an insurance policy, is a question of law we determine de novo. (*MacKinnon v. Truck Insurance Exchange* (2003) 31 Cal.4th 635, 641.)

### 2. Ambiguous

Simmons contends the term "medical policy" is ambiguous and therefore must be construed against Blue Shield.

" 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citation.] A term is not ambiguous merely because the policies do not define it. [Citations.] Nor is it ambiguous because of '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' [Citation.] ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' [Citations.] 'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Continental, supra,* 55 Cal.4th at pp. 194-195.)

Here, the term "Blue Shield medical policy" is not defined in the "Medically Necessary" provision. Although the term appears in four other sections of the 2007 and 2008 plan documents, it remains undefined.[12] Yet, a term that is not defined is not necessarily ambiguous. (*Carson v. Mercury Insurance Company* (2012) 210 Cal.App.4th

---

[12]    The term appears in sections related to covered bariatric services, genetic testing in outpatient laboratories, multiple surgical procedures, and special transplant benefits.

25

409, 426-427 (*Carson*), citing *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866.)

The references to a Blue Shield "medical policy," when considered together, suggest a rule, guideline, or set of guidelines, independent of the plan documents, that Blue Shield will use to determine whether to cover a particular treatment or service. (*Clarendon America Ins. Co. v. North American Capacity Ins. Co.* (2010) 186 Cal.App.4th 556, 566 [court must consider the entire policy in its analysis].)  Some of the provisions state the listed service will only be covered if it is medically necessary *and* consistent with Blue Shield medical policy.  Although this makes the use of "medical policy" redundant, it also suggests consistency with the medical policy is a condition for coverage that must be met in addition to, and apart from, the other factors in the medical necessity definition.  In some provisions, consistency with the medical policy is to be considered in addition to the circumstances of the subscriber, thus suggesting the medical policy is not patient-specific.

The term "policy," as commonly understood, refers to a procedure, course of action that guides future decisions, or an overall plan.  (Webster's New Collegiate Dict. (10th ed. 2002) p. 898 ["policy" means "prudence or wisdom in the management of affairs"; "management or procedure based primarily on material interest"; "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions"; or "a high-level overall plan embracing the general goals and acceptable procedures esp. of a governmental body"].)  A layperson would likely understand "medical policy" to mean some sort of internal guidance on coverage issues, even if not at the level of specificity of the actual medical policy or policies.  (*Baker v. National Interstate Ins. Co.* (2009) 180 Cal.App.4th 1319, 1340.)

Simmons convincingly asserts that the term "medical policy" does not clearly mean the specific guidelines Blue Shield relied upon to deny coverage for Fentora. But we are unable to discern another potential meaning of "medical policy" that would indicate Blue Shield would make coverage and medical necessity decisions without

relying on some internal guidance, rule, or plan. In that sense, the term is not ambiguous. Further, while a layperson reading the Plan may not know what exactly the "medical policy" is, the Plan is not ambiguous in stating that Blue Shield will determine four of the factors necessary for a service to be deemed medically necessary; all factors of "medical necessity" must be present for Blue Shield to cover a service; and Blue Shield will consider factors not specific to the patient in its coverage decisions.

"[W]e do not find contract language ambiguous in the abstract. Rather, we construe contractual language in the context of the instrument as a whole, and under the circumstances of the case." (*Van Ness v. Blue Cross of California* (2001) 87 Cal.App.4th 364, 373 (*Van Ness*).) Certainly, "Blue Shield medical policy" could have been defined or explained with greater clarity in the Plan. But "insurance provisions need not be perfectly drafted . . . . [P]olicy language is not misleading and unenforceable just because it could be more explicit or precise." (*Van Ness, supra,* 87 Cal.App.4th at p. 375, fn. 4, citation omitted.)

Simmons also briefly contends the "medical policy" factor does not meet the requirement that policy exclusions be "conspicuous, plain, and clear." (*Haynes, supra,* 32 Cal.4th at p. 1204.) However, aside from stating the contention and quoting the relevant legal standard, Simmons offers no analysis to support his argument. He makes no attempt to apply the legal principles he cites to the facts of this case. This is insufficient. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellant['s] argument for [him]. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' [Citations.]" (*Cahill, supra,* 194 Cal.App.4th at p. 956.)

Under the terms of the Plan, Blue Shield could conclude Fentora as prescribed for Simmons was not medically necessary because it was not consistent with Blue Shield medical policy. It was undisputed that Simmons's use of Fentora was not consistent with

Blue Shield medical policy.  There was no triable issue of fact on the breach of contract claim.

## IV.   Bad Faith Claim

Simmons also asserted a claim for breach of the implied covenant of good faith and fair dealing.  We conclude Blue Shield established there were no triable issues of fact as to its genuine dispute defense.

### A.  General Principle

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing.  'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits.  To fulfill its implied obligation, an insured must give at least as much consideration to the interests of the insured as it gives to its own interests.  When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).)

### B.  Breach of an Express Provision of the Plan Is Not Required to Maintain an Action for Breach of the Implied Covenant of Good Faith and Fair Dealing

Blue Shield argues the bad faith claim fails as a matter of law because the Plan allowed it to deny coverage based on inconsistency with the medical policy.  We do not agree under the circumstances of this case.

"As a general rule, . . . there can be no breach of the implied covenant of good faith and fair dealing if no benefits are due under the policy:  'The covenant is based on the contractual relationship between the insured and the insurer . . . .  Absent that contractual right [to policy benefits], the implied covenant has nothing upon which to act as a supplement, and "should not be endowed with an existence independent of its contractual underpinnings." ' [Citations.]" (*Brehm IV v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1235 (*Brehm*), quoting *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.)

28

However, "[i]t is well established that a breach of the implied covenant of good faith is a breach of the contract [citation], and that breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing. [Citations.] Similarly, even an insurer that pays the full limits of its policy may be liable for breach of the implied covenant, if improper claims handling causes detriment to the insured." (*Schwartz v. State Farm Fire & Casualty Company* (2001) 88 Cal.App.4th 1329, 1339; see also *Carson, supra,* 210 Cal.App.4th at p. 429.)

Moreover, as explained in *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 (*Carma*), "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. . . . It is of course a simple matter to determine whether given conduct is within the bounds of a contract's express terms. For this it is enough that the conduct is either expressly permitted or at least not prohibited. Difficulty arises in deciding whether such conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations." Thus, in the insurance context, for example, an insurer's failure to accept a reasonable offer to settle a claim against the insured may expose the insurer to liability for breach of the implied covenant, even though the insurer has fulfilled the express terms of the policy. (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659; *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 463-466.)

Similarly, in *Brehm*, the insurance policy in question granted the parties the right to arbitrate any dispute if they did not agree on whether the insured was entitled to recover damages from an uninsured motorist, or the amount of such damages. The insurer argued its decision to seek arbitration could not constitute a breach of the implied covenant of good faith and fair dealing, because the contract expressly permitted that decision. (*Brehm, supra,* 166 Cal.App.4th at p. 1241.) The *Brehm* court concluded that although the insurer had a right to demand arbitration, the implied covenant required that

29

it first "attempt in good faith to reach agreement with its insured prior to arbitration." (*Id.* at p. 1242.) The insurer had an obligation to honestly assess the insured's claim and make a reasonable effort to resolve any dispute before invoking the right to arbitrate. (*Ibid.*)

Equally pertinent to our discussion is the "rule that ' "[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." [Citations.]' [Citation.] In such circumstance, a breach of the implied covenant can result from conduct permitted by the express (or implied-in-fact) terms of the contract." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1394, fn. 16 (*Careau*); see also *Carma, supra,* 2 Cal.4th at p. 372; *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500; *Jacob v. Blue Cross and Blue Shield* (Or.App. 1988) 758 P.2d 382, 384, fn. 1 [policy defined "medically necessary" as contingent on insurer's interpretation of community standards; court noted insurer did not have unlimited discretion because it was required to apply objective standards of policy exclusions, and to carry out contractual obligations in good faith].)

Here, Blue Shield contends the Plan expressly allowed it to deny coverage when a treatment is not consistent with the Blue Shield medical policy, thus there could be breach of the implied covenant. However, the allegation in this case is that Blue Shield relied on a medical policy that varied from community medical standards, and was unreasonable. The Plan does not define or explain the medical policy in any detail. It offers no indication of how Blue Shield will arrive at the medical policy. It does not rule out the possibility that the medical policy may be arbitrary, inconsistent with other factors of the medical necessity provision, or conflict with the standards in the subscriber's relevant medical community regarding when a treatment is appropriate for a particular condition. The Plan does not clearly inform the subscriber how to learn what the "medical policy" is for any particular treatment. It also allows Blue Shield to determine what the medical policy is, and whether a treatment is consistent with that policy, as required for coverage. It does not expressly allow Blue Shield to employ a medical

policy that is unreasonable, arbitrary, or significantly varies from relevant community medical standards. Any such medical policy would frustrate the purposes of the Plan, and the subscriber's legitimate expectations. In the absence of any contrary language in the Plan, the subscriber has a reasonable expectation that the medical policy itself will not be arbitrary and will be consistent with community medical standards, as well as the objective standards set forth in the Plan with respect to specific services or treatments.

As explained in *Careau, supra,* 222 Cal.App.3d at page 1395, "allegations which assert [a bad faith claim] must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties."

If Blue Shield uses its discretionary power in setting and relying on its medical policy to unfairly frustrate the agreed common purposes of the insurance agreement and disappoints the reasonable expectations of the insured, it may still be liable for breaching the implied covenant of good faith and fair dealing, even if it has not breached an express provision of the agreement. (*Brehm, supra,* 166 Cal.App.4th at pp. 1235-1236.)

This reasoning is consistent with the court's analysis in *Hughes*. In *Hughes*, an arbitrator determined the insured had a right to benefits for her son's hospitalization, benefits Blue Cross had denied on the ground that the hospitalization was not medically necessary. (*Hughes, supra,* 215 Cal.App.3d at p. 841.) The insured then went to trial on a claim for breach of the implied covenant of good faith and fair dealing and won. (*Id.* at p. 838.) On appeal, Blue Cross argued substantial evidence did not support the verdict. (*Ibid*.)

The Court of Appeal rejected the substantial evidence challenge. The opinion does not discuss how "medical necessity" was defined or described in the insured's

31

policy. However, the court reasoned that "[i]n a medical insurance policy, the insured's expectation of security is relevant to the interpretation of medical necessity." (*Hughes, supra,* 215 Cal.App.3d at p. 845.) The court discussed *Sarchett,* then explained: "If the insurer employs a standard of medical necessity significantly at variance with the medical standards of the community, the insured will accept the advice of his treating physician at a risk of incurring liability not likely foreseen at the time of entering the insurance contract. Such a restricted definition of medical necessity, frustrating the justified expectations of the insured, is inconsistent with the liberal construction of policy language required by the duty of good faith. It is true that the practice of retroactive review, which the *Sarchett* decision sanctions, will inevitably introduce a degree of uncertainty as to insurance coverage. But good faith demands a construction of medical necessity consistent with community medical standards that will minimize the patient's uncertainty of coverage in accepting his physician's recommended treatment." (*Hughes, supra,* at pp. 845-846.)

In our view, *Hughes* continues to apply in a case such as this one, in which medical necessity includes the requirement that a treatment be consistent with Blue Shield's medical policy. As a result, that Blue Shield may use inconsistency with its medical policy as a basis to deny coverage, does not, as a matter of law, indicate it has not breached the implied covenant of good faith and fair dealing, however unreasonable or unexpected the medical policy may be.

### C. Genuine Dispute

Although we reject Blue Shield's argument that Simmons's bad faith claim related to Fentora failed as a matter of law because it was allowed to rely on its medical policy to deny coverage, we agree that there was no triable issue of fact on Blue Shield's genuine dispute defense.

32

### 1. The Genuine Dispute Defense

In *Wilson, supra,* 42 Cal.4th 713, the California Supreme Court explained both the genuine dispute rule, and its role as a basis for summary judgment:

"[A]n insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. [Citation.] As a close corollary of that principle, it has been said that 'an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.' [Citation.] This 'genuine dispute' or 'genuine issue' rule was originally invoked in cases involving disputes over policy interpretation, but in recent years courts have applied it to factual disputes as well. [Citations.]

"The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. [Citations.] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson, supra,* 42 Cal.4th at pp. 723-724.)

33

## 2. No Triable Issues

In this case, Blue Shield presented evidence demonstrating it relied on its medical policy to deny coverage for Fentora. Simmons contends Blue Shield did not meet its burden to show that the medical policy for Fentora was consistent with community medical standards or that it acted reasonably in denying coverage for Fentora. We conclude the record demonstrates the absence of triable issues as to whether Blue Shield's disputed position was reached reasonably and in good faith.

Blue Shield presented evidence that the medical policy on Fentora was established by Blue Shield's pharmacy and therapeutics committee, "whose voting members do not work for Blue Shield, and who are physicians and clinical pharmacists in community practice. [¶] . . . In setting Blue Shield's medical policy for a given medication, the committee reviews the clinical and scientific evidence relating to the medication and, based on that review, establishes guidelines and medical policy positions as to whether or not the medication is safe and effective and covered by the Plan." Blue Shield also presented evidence indicating the drug manufacturer described Fentora as a drug indicated only to treat breakthrough pain in opioid-tolerant cancer patients, and that the FDA had approved the drug only to treat breakthrough cancer pain in opioid-tolerant patients. Moreover, the record established an independent medical reviewer for the DMHC found Fentora was not medically necessary for Simmons because of a lack of medical studies in the literature supporting the use of Fentora for Simmons's condition, and because Fentora's "efficacy for the treatment of [Simmons's] condition has not been established."

Simmons's competing evidence was that Lin prescribed Fentora for him, and it was the drug that had worked best to address his pain. However, that evidence did not create a triable issue of fact as to whether Blue Shield's position in denying coverage for Fentora was reached reasonably and in good faith. (See *Sarchett, supra,* 43 Cal.3d at p. 10 [insurer did not violate duty of good faith and fair dealing by disagreeing with the judgment of the treating physician on retrospective review].) Simmons argued it was unreasonable for Hartman to evaluate the claim for coverage because his specialty has

34

nothing to do with Simmons's condition, pharmaceuticals, or pain management. Yet, Hartman's job was primarily to ascertain whether use of the drug in Simmons's case was consistent with the Blue Shield medical policy, based on a review of Simmons's medical records and the medical criteria set forth in the medical policy. It is not clear this required anything more than general medical expertise. If the medical policy was not significantly at variance from general standards of the medical community, there is nothing apparently unreasonable in Blue Shield's representative relying on that policy to make a coverage determination.

In light of the manufacturer and FDA indications for Fentora, and the DMHC finding, no trier of fact could reasonably conclude Blue Shield acted unreasonably in relying on its medical policy as a basis to deny coverage in this case. At a minimum, even under Simmons's version of the facts, there was a genuine dispute as to whether Blue Shield was required to provide coverage for Fentora.

Simmons further argues Blue Shield's actions in denying coverage were unreasonable because it failed to conduct a thorough investigation. (*Wilson, supra,* 42 Cal.4th at pp. 720-721, 723 [insurer must fully inquire into possible bases that might support the insured's claim before denying it; insurer may not just focus on those facts which justify denial of the claim].) Simmons's argument assumes Blue Shield was required to assess medical necessity independent of its medical policy. If there were any evidence from which a jury could find the medical policy was itself unreasonable or at variance with community standards, then the fact that Hartman evaluated and investigated Simmons's claim only to determine whether his Fentora use was consistent with the Blue Shield medical policy might suggest bad faith. But, as explained above, there was no evidence from which a jury could infer the medical policy was unreasonable.

Further, there was no evidence that Blue Shield's investigation of Simmons's Fentora claim was otherwise insufficiently thorough. Given the medical policy, the scope of the necessary investigation was narrow. Blue Shield informed Dr. Lin of additional evidence it would consider relevant to the application of the medical policy to Simmons's

35

individual circumstances. This included peer-reviewed literature regarding off-label use of Fentora, and clinical reasons preventing Simmons from using formulary alternatives. There is no evidence Lin provided such information in response. There was no evidence from which a jury could reasonably conclude Blue Shield did not meet its obligation to thoroughly and fairly investigate Simmons's claim for coverage under the plan. As such, Blue Shield could rely on a genuine dispute defense. Simmons did not refute Blue Shield's showing that it reached its position for denying coverage for Fentora in good faith and on reasonable grounds.

*Hughes* provides a helpful contrast. In *Hughes*, the court found the jury could reasonably conclude Blue Cross employed a standard of medical necessity "sufficiently at variance with community standards to constitute bad faith." (*Hughes, supra,* 215 Cal.App.3d at p. 846.) The evidence supporting this conclusion was based largely on admissions made by the Blue Cross consultant reviewing the claim. He admitted that he recommended disapproval of around 30 percent of the claims he reviewed, and spent only 12 minutes on each claim. (*Id.* at p. 843.) He was "unswayed by the fact that his recommendation conflicted with that of other psychiatrists . . . who were familiar with the case, and evinced little interest in the opinion of [a psychiatrist] who reviewed the patient's charts to make the same determination of medical necessity each week of his hospitalization." (*Ibid.*) The reviewing consultant also testified that while the consensus of the psychiatric community was one factor to be considered, he used an independent judgment and "seemed to allow that his standard of medical necessity might be more restrictive than the generally accepted professional standard." (*Ibid.*)

In addition, the evidence did not indicate that the reviewing consultant reviewed records relating to the patient's prior hospitalizations. (*Hughes, supra,* 215 Cal.App.3d at p. 844.) The consultant appeared unconcerned about securing complete documentation. Blue Cross letters to the treating physician stated the insurer had concluded hospitalization was not medically necessary, but did not disclose the medical grounds for the determination. (*Ibid.*) The letters also did not identify the records on which the consultant's recommendation was based, making it impossible for anyone to recognize

36

that not all relevant records had been provided to the consultant. (*Id.* at p. 846.) This was all evidence that Blue Cross did not meet its burden to seek information relevant to the claim. (*Ibid.*)

The evidence in this case was quite different. The manufacturer indications and FDA guidelines indicated the medical policy allowing Fentora use only in opioid-tolerant cancer patients suffering breakthrough pain was in line with community standards, and this was confirmed by the DMHC findings. There was no evidence that the medical policy was arbitrary or unreasonable. Blue Shield informed Lin and Simmons of the specific reason for the denial of coverage. The initial notice of review of the claim solicited specific information from Lin. The Plan allowed for preauthorization so the patient and physician could know in advance whether a drug is covered. Given the medical policy, the range of necessary inquiry was narrow. There is no indication Simmons had or could produce any evidence like that presented to the jury in *Hughes* demonstrating bad faith.

Blue Shield established there were no triable issues of material fact on its genuine dispute defense to the bad faith claim, thus it was properly subject to summary disposition. In light of the above conclusions, we need not consider the parties' arguments regarding punitive damages.

## DISPOSITION

The trial court judgment is affirmed. Respondent shall recover its costs on appeal.


BIGELOW, P. J.

We concur:


FLIER, J.



GRIMES, J.

37